IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RICHARD ALLEN and JEREMY GUY,  )<br>       Plaintiff,                                    )<br>                                                         )<br>v.                                                      )     Civil Action No. 1:22-cv-00328-KD-B<br>                                                         )<br>AUSTAL USA, LLC,                            )<br>       Defendant.                                )   | |

**ORDER**

This action is before the Court on the Plaintiffs' Motion for Partial Summary Judgment, (Doc. 88); the Response, (Doc. 95), filed by Defendant Austal USA, LLC ("Austal"); and the Plaintiffs' Reply. (Doc. 96). This action involves the claims of numerous Plaintiffs under a variety of theories regarding Austal's vaccine mandate during the COVID-19 pandemic. Upon consideration, and for the reasons below, the motion is **DENIED**.

**I.     Findings of Fact[1]**

**A.  Austal USA, LLC and Plaintiffs**

Austal is a federal contractor as it contracts with the United States Navy to build ships. During the relevant time period, Rusty Murdaugh ("Murdaugh") was Austal's president; Mike Bell ("Bell") worked as Vice President of Operations; Sandra Koblas ("Koblas") was Vice President of Human Resources; Samuel Cordts ("Cordts") was Director of Health and Safety; Rodney Patrick was the Employee Relations Manager; Ryan Lee ("Lee") was Senior Manager of Training and Organizational Development; Bridget Jewett was a Human Resources Business Partner; and Jeanette Whatley was an Occupational Nurse Coordinator.

---

[1] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013).

While at Austal, Plaintiffs held a variety of job positions including fitter, welder, electrician, supervisor, and others. In large part, these positions required Plaintiffs to regularly work with their team or crew. Also, Plaintiffs regularly attended start of shift meetings with their crews.

**B. COVID-19 Pandemic and Vaccine Mandates**

The World Health Organization ("WHO") declared COVID-19 as a pandemic on March 11, 2020. National Library of Medicine, https://pmc.ncbi.nlm.nih.gov/articles/PMC7569573/ (last visited Dec. 2, 2024). On September 9, 2021, President Joe Biden signed Executive Order 14042 ("EO 14042"). See Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 FR 50985 (Sep. 9, 2021). EO 14042 established a requirement that all federal contractor employees be vaccinated. Id. EO 14042 directed the Federal Workforce Task Force to develop workplace COVID-19 safety standards with which federal contractors governed by the EO would have to comply. Id. In turn, the Task Force issued guidance on September 24, 2021, requiring the contractors to mandate that their employees be fully vaccinated (meaning, two weeks after receiving the Johnson & Johnson/Janssen vaccine or the second dose of the Pfizer or Moderna vaccine) by December 8, 2021, unless granted an exemption. New Guidance on COVID-19 Workplace Safety for Federal Contractors, WHITE HOUSE https://www.whitehouse.gov/omb/briefing-room/2021/09/24/new-guidance-on-covid-19-workplace-safety-for-federal-contractors/ (last visited Dec. 3, 2024).

On or about November 5, 2021, the Occupational Safety and Health Administration ("OSHA") issued an Emergency Temporary Standard ("ETS") that would require employers of 100 or more employees to perform periodic testing of unvaccinated employees. See COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 FR 61402 (Nov. 5, 2021). That ETS was

2

ultimately withdrawn by OSHA in January 2022. See COVID-19 Vaccination and Testing; Emergency Temporary Standard, 87 FR 3928-01 (Jan. 26, 2022).

On October 1, 2021, Austal issued a communication to its workforce regarding the federal mandate. In that communication, employees were informed that Austal was subject to the federal mandate and that all employees were required to receive and report receipt of the Johnson & Johnson/Janssen vaccine or their first shot of the Pfizer or Moderna vaccine by October 27 and the second doses of the Pfizer or Moderna vaccine by November 24. In that same communication, Austal informed its employees that any employee who had a disability, who was pregnant, who was a nursing mother, who had a qualifying medical condition contraindicating vaccination, or who objected to being vaccinated on the basis of a sincerely-held religious belief/practice could request an exemption from the vaccination.

### C. Accommodation/Exemption Process for Religious Exemptions

Human Resources provided each employee requesting an exemption with a request form. As part of the evaluation process, Human Resources met with each employee's management/supervisory team to discuss the employee's job interactions with others (such as co-workers, managers, and customers). The information gathered was used to determine what, if any, safety protocols the employee would have to follow if his/her request for exemption was granted.

### D. Austal's Attempts to Accommodate

In total, Austal received almost 160 religious exemption requests. Human Resources interviewed the management/supervisory teams of all employees but determined that no employee worked in isolation and that each employee had regular interactions with other employees.

Lee sought health and regulatory guidance on how to preserve employee safety and health if they were not vaccinated. Lee consulted with medical and health personnel both at the University

of South Alabama and the Mobile County Health Department. Through those discussions, and in consideration of the anticipated OSHA ETS, Austal determined that unvaccinated employees would be required to submit to bi-weekly onsite testing provided by Austal, as well as continued masking and social distancing where possible.

In an effort to evaluate the feasibility of a bi-weekly onsite testing program, Austal assessed the cost, mechanics, and logistics of how the program would work for the nearly 160 employees requesting religious exemptions—while bearing in mind that Austal could not require employees to pay for their own tests. Lee assembled a spreadsheet that took into account the cost of the test itself, the fact that the employees would be on-the-clock for the approximate thirty minutes of testing, the costs of administrative labor in supervising and tracking testing, and the projected costs of false positives that would mandate added testing utilizing a medical services vendor and employee time off work. Lee and Austal took into account that administration of the testing program would require, among other things, additional reporting to check the shift/status/attendance of the unvaccinated employee, communications with the employee's supervisor, managing potential non-compliance with testing requirements, preparing tests and testing sites, witnessing tests, and logging and tracking test results.

Based on the calculations, Austal was facing an approximate cost in excess of $1,000,000.00 per year to perform bi-weekly testing, aside from the administrative costs. In consideration of this estimate, the potential administrative issues, and the obligation to protect the health of its employees, Austal determined that a bi-weekly testing program would pose a significant undue hardship on the company and that there was no other feasible method to accommodate those seeking religious exemptions from the vaccine requirement. Austal looked at what it could accommodate and granted some medical exemptions but denied all religious exemptions. Austal

did not meet with any of the employees requesting a religious exemption before denying their requests.

## II.     Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut. Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

### III. Analysis

Plaintiffs move for summary judgment on their Title VII claims against Austal. Plaintiffs argue that Austal, as the defendant, bears the burden of proof on its affirmative defense of "undue hardship." For the following reasons, Plaintiffs' motion for summary judgment as to their Title VII claims is denied.

Plaintiffs argue that Austal's process for denying the religious accommodation requests is so legally defective as to entitled Plaintiffs to judgment as a matter of law. Plaintiffs' reasoning is that "Title VII requires some affirmative action by the employer to help resolve the employee's religious conflict." (Doc. 88 at 4). In support, Plaintiffs cite several cases explaining ways in which an employer can reasonably accommodate employees. See E.E.O.C. v. Texas Hydraulics, Inc., 583 F. Supp. 2d 904, 911 (E.D. Tenn. 2008) (explaining that the employer could have reasonably accommodated the employee by making other employees aware of the religious conflict and asking if they would be willing to swap shifts); E.E.O.C. v. Robert Bosch Corp., 169 F. App'x 942, 944–45 (6th Cir. 2006) ("In addition to allowing voluntary shift swaps, some employers have curried favor with affirmative actions like holding meetings with the employee, attempting to find the employee another job, supplying the employee with a roster sheet containing the schedules of co-

workers, and allowing the employee to advertise his need for shift swaps during daily roll calls and on the employer's bulletin board.").

Plaintiffs also cite caselaw to support the proposition that the employer is obligated to work with the employee in identifying possible accommodations. See Moates v. Hamilton Cnty., 976 F. Supp. 2d 984, 993 (E.D. Tenn. 2013) (explaining that the ADA "does require the employer . . . 'to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation.'" (quoting 29 C.F.R. § 160.2(o)(3)); E.E.O.C. v. Aldi, Inc., No. CIV.A. 06-01210, 2008 WL 859249, at *12 (W.D. Pa. Mar. 28, 2008) ("Title VII's reasonable accommodation provisions contemplate an *interactive process*, with cooperation between the employer and the employee, *but which must be initiated by the employer*." (quoting Kenner v. Domtar Industries, Inc., No. 04-CV-4021, 2006 WL 662466 at *1 (W.D. Ark. March 13, 2006)); Nichols v. Illinois Dep't of Transportation, 152 F. Supp. 3d 1106, 1124 (N.D. Ill. 2016) (explaining that a dispute issue of fact existed over the question of undue hardship in part because the employer never engaged in any dialogue with the employee about his request for accommodation).

None of the cases cited by Plaintiffs resulted in the granting of summary judgment in favor of the plaintiff on a Title VII claim. Moreover, in a footnote, Plaintiffs concede that the failure to confer with the employee is not an independent violation of Title VII. (Doc. 88 at 7 n.2). Indeed, nowhere in Groff v. DeJoy does the Court use the phrase "interactive process." 600 U.S. 447 (2023). And Plaintiffs have not cited a single case from the Eleventh Circuit which states that an "interactive process" is necessary before an employer can prove an undue hardship. The "interactive process" requirement comes from the language of the ADA, not Title VII. Even in the ADA context, "an employer's failure to engage in the interactive process alone is not an independent basis for liability . . . ." Spurling v. C & M Fine Pack, Inc., 739 F.3d 1055, 1062 (7th

7

Cir. 2014). Therefore, the fact that Austal did not communicate with Plaintiffs before it denied their religious accommodation requests does not preclude Austal from proving it faced an undue hardship.

As detailed in Austal's response, Austal assessed whether a reasonable accommodation was possible for the religious exemption requests. Austal's Human Resources met with each employee's management/supervisory team to discuss the employee's job interactions with others (such as co-workers, managers, and customers). Austal relied on objective data and guidance from the University of South Alabama and the Mobile County Department of Health to determine that maintaining a safe workplace with nearly 160 religious objectors to the vaccination would require biweekly testing. Austal researched the estimated cost of reasonably accommodating the religious exemption requests. Therefore, Plaintiffs' motion for partial summary judgment on the reasonable accommodation claims is denied.

### IV.  Conclusion

Plaintiffs appear to argue that Austal should have considered accommodations other than bi-weekly testing. However, Plaintiffs failed to even suggest what other accommodations should have been considered or were possible. Plaintiffs' summary judgment is **denied**.

**DONE** and **ORDERED** this **20th** day of **December 2024.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**