**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RICHARD ALLEN and JEREMY GUY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:22-cv-00328-KD-B** |
| | ) | |
| **AUSTAL USA, LLC,** | ) | |
| **Defendant.** | ) | |

<u>**ORDER**</u>

This action is before the Court on the Motion for Summary Judgment, (Doc. 86), and the Brief in Support, (Doc. 87), filed by Defendant Austal USA, LLC ("Austal"); the Response, (Doc. 94), filed by Plaintiffs; and Austal's Reply, (Doc. 97). This action involves the claims of numerous Plaintiffs under a variety of theories regarding Austal's vaccine mandate during the COVID-19 pandemic. This order addresses the claims of **Plaintiffs Richard Allen** and **Jeremy Guy** ("Plaintiffs"). Upon consideration, and for the reasons below, the motion is **GRANTED in part**.

**I.     Findings of Fact[1]**

**A.  Austal USA, LLC**

Austal is a federal contractor as it contracts with the United States Navy to build ships. At all relevant times, Austal has had in place an Equal Employment Opportunity policy, which prohibits discrimination based on protected characteristics including religion. The policy directed employees who believed that they had been subjected to discrimination or harassment to report it to Human Resources. During the relevant time period, Rusty Murdaugh ("Murdaugh") was Austal's president; Mike Bell ("Bell") worked as Vice President of Operations; Sandra Koblas ("Koblas") was Vice President of Human Resources; Samuel Cordts ("Cordts") was Director of

---

[1] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." <u>Feliciano v. City of Miami Beach</u>, 707 F.3d 1244, 1247 (11th Cir. 2013).

Health and Safety; Rodney Patrick was the Employee Relations Manager; Ryan Lee ("Lee") was Senior Manager of Training and Organizational Development; Bridget Jewett was a Human Resources Business Partner; and Jeanette Whatley was an Occupational Nurse Coordinator.

### B. Plaintiffs' Positions at Austal

While at Austal, Plaintiffs held a variety of job positions, including fitter, welder, electrician, and supervisor. These positions required Plaintiffs to regularly work with others on their team or crew. Plaintiffs also regularly attended start of shift meetings with their crews, which was comprised of approximately 12–20 people.

### C. COVID-19 Pandemic and Austal's Response

The World Health Organization ("WHO") declared COVID-19 as a pandemic on March 11, 2020. National Library of Medicine, https://pmc.ncbi.nlm.nih.gov/articles/PMC7569573/ (last visited Dec. 2, 2024). Austal was still considered an essential employer, given that it was charged with building ships for the United States Navy. As such, Austal provided to employees who had immune issues or otherwise had concerns regarding the pandemic with leave in the Spring of 2020. Austal, where possible, put into place social distancing requirements. Austal required employees to wear masks and provided masks to employees. Austal provided hand sanitizer to employees. Austal employed cleaning crews to perform extra cleaning, particularly in areas where an employee had tested positive for COVID-19. Austal tracked COVID-19 cases by work area in an effort to engage in contact tracing. Employees who tested positive for COVID-19, or who were exposed to COVID-19, were required to quarantine consistent with Centers for Disease Control ("CDC") requirements.

### D.  Federal COVID-19 Vaccine Mandate and Austal's COVID-19 Vaccine Mandate

On September 9, 2021, President Joe Biden signed Executive Order 14042 ("EO 14042"). See Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 FR 50985 (Sep. 9, 2021). EO 14042 established a requirement that all federal contractor employees be vaccinated. Id. EO 14042 directed the Federal Workforce Task Force to develop workplace COVID-19 safety standards with which federal contractors governed by the EO would have to comply. Id. In turn, the Task Force issued guidance on September 24, 2021, requiring the contractors to mandate that their employees be fully vaccinated (meaning, two weeks after receiving the Johnson & Johnson/Janssen vaccine or the second dose of the Pfizer or Moderna vaccine) by December 8, 2021, unless granted an exemption. New Guidance on COVID-19 Workplace Safety for Federal Contractors, WHITE HOUSE https://www.whitehouse.gov/omb/briefing-room/2021/09/24/new-guidance-on-covid-19-workplace-safety-for-federal-contractors/ (last visited Dec. 3, 2024).

On or about November 5, 2021, the Occupational Safety and Health Administration ("OSHA") issued an Emergency Temporary Standard ("ETS") that would require employers of 100 or more employees to perform periodic testing of unvaccinated employees. See COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 FR 61402 (Nov. 5, 2021). That ETS was ultimately withdrawn by OSHA in January 2022. See COVID-19 Vaccination and Testing; Emergency Temporary Standard, 87 FR 3928-01 (Jan. 26, 2022).

Shortly before entry of EO 14042, Austal implemented a mandatory vaccination policy for Austal's leadership, which required those employees to be vaccinated by October 8, 2021. The October 8, 2021, deadline was later extended to align with the federal mandate of EO 14042.

On October 1, 2021, Austal issued a communication to its workforce regarding the federal mandate. In that communication, employees were informed that Austal was subject to the federal

mandate and that all employees were required to receive and report receipt of the Johnson & Johnson/Janssen vaccine or their first shot of the Pfizer or Moderna vaccine by October 27 and the second doses of the Pfizer or Moderna vaccine by November 24. In that same communication, Austal informed its employees that any employee who had a disability, who was pregnant, who was a nursing mother, who had a qualifying medical condition contraindicating vaccination, or who objected to being vaccinated on the basis of a sincerely-held religious belief/practice could request an exemption from the vaccination. Many Austal employees discussed the mandate, as well as their position on taking the vaccine. Guy recalls discussing his vaccination decision with his supervisor. (Doc. 83-4 at 11). Allen recalls discussing his vaccination decision with his wife, uncle, and pastor as well as another Austal employee (Scott Norsworthy) and in morning meetings. (Doc. 83-4 at 6).

Austal hosted onsite vaccination clinics on October 7, 8, 14, 15, 21, 22, 26, and 27 in an effort to assist employees in obtaining the vaccination. On October 5, 2021, Austal provided employees with specific instructions on how to request an exemption. The internal deadline set for the submission of religious exemption requests was October 15, 2021.

Austal also required unvaccinated workers—but not vaccinated employees—to wear masks. And Austal allowed only vaccinated employees to wear stickers indicating that they were vaccinated.

### E.  Accommodation/Exemption Process for Religious Exemptions

Human Resources provided each employee requesting an exemption with a request form. The form asked the employee to provide information about the religious belief precluding vaccination, including whether a pastor or minister could be contacted. Austal did not question or analyze

whether an employee had a sincerely held religious belief. In other words, Austal assumed that the stated belief was sincerely held and proceeded to the undue hardship analysis.

As part of the evaluation process, Human Resources met with each employee's management/supervisory team to discuss the employee's job interactions with others (such as co-workers, managers, and customers). The information gathered was used to determine what, if any, safety protocols the employee would have to follow if his/her request for exemption was granted.

### F. Plaintiffs' Requests for Accommodation/Exemption

Plaintiffs (for purposes of this brief) submitted religious exemption requests. These exemption requests included but were not limited to: statements regarding the body as a temple; contentions that the COVID-19 vaccine was derived from aborted fetal cells and that the Bible forbids murder; and reliance upon various passages of Scripture.

### G. Austal's Attempts to Accommodate

In total, Austal received almost 160 religious exemption requests. Human Resources interviewed the management/supervisory teams of all employees but determined that no employee worked in isolation and that each employee had regular interactions with other employees.

Lee sought health and regulatory guidance on how to preserve employee safety and health if they were not vaccinated. Lee consulted with medical and health personnel both at the University of South Alabama and the Mobile County Health Department. Through those discussions, and in consideration of the anticipated OSHA ETS, Austal determined that unvaccinated employees would be required to submit to bi-weekly onsite testing provided by Austal, as well as continued masking and social distancing where possible.

In an effort to evaluate the feasibility of a bi-weekly onsite testing program, Austal assessed the cost, mechanics, and logistics of how the program would work for the nearly 160 employees

requesting religious exemptions—while bearing in mind that Austal could not require employees to pay for their own tests. Lee assembled a spreadsheet that took into account the cost of the test itself, the fact that the employees would be on-the-clock for the approximate thirty minutes of testing, the costs of administrative labor in supervising and tracking testing, and the projected costs of false positives that would mandate added testing utilizing a medical services vendor and employee time off work. Lee and Austal took into account that administration of the testing program would require, among other things, additional reporting to check the shift/status/attendance of the unvaccinated employee, communications with the employee's supervisor, managing potential non-compliance with testing requirements, preparing tests and testing sites, witnessing tests, and logging and tracking test results.

Based on the calculations, Austal was facing an approximate cost in excess of $1,000,000.00 per year to perform bi-weekly testing, aside from the administrative costs.[2] In consideration of this estimate, the potential administrative issues, and the obligation to protect the health of its employees, Austal determined that a bi-weekly testing program would pose a significant undue hardship on the company and that there was no other feasible method to accommodate those seeking religious exemptions from the vaccine requirement. Austal looked at what it could accommodate and granted some medical exemptions but denied all religious exemptions. Austal did not meet with any of the employees requesting a religious exemption before denying their requests.

---

[2] Austal USA's 2021 revenue was $1,176,604,000.00. (Doc. 94-2 at 3).

### H.  Plaintiffs' Termination and Lawsuit

On or about October 22, 2021, a Human Resources representative spoke with employees who requested religious exemptions and let them know that their request could not be approved. Each employee was reminded that they had until October 27, 2021, to provide proof of vaccination.

On October 26, 2021, Austal communicated with all employees from whom it did not have proof of vaccination. Austal asked those who had chosen to not get vaccinated to inform their Human Resources representatives promptly so that plans could be made for separation of employment at the end of their shift on October 27, 2021. Austal offered administrative leave for October 28–29, 2021, for employees who remained undecided about vaccination. These employees were required to provide proof of vaccination by October 31, 2021. Austal would then process terminations of any employees who did not verify proof of vaccination by November 1, 2021. No one told Plaintiffs that they were being terminated because of religion.

Plaintiffs' operative complaint alleges (1) that Austal violated Title VII, 42 U.S.C. § 2000e by failing to accommodate their religious exemption; (2) that Austal was negligent in the way it handled the COVID-19 pandemic; and (3) that Austal invaded their privacy by inquiring about their vaccination status. (Doc. 49).[3]

### II.    Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

---

[3] The Court previously adopted the Report and Recommendation of the Magistrate Judge, (Doc. 59), which dismissed the remaining counts of the amended complaint. (Doc. 60).

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut. Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

### III.    Analysis

Plaintiffs allege three causes of action against Austal: (1) failure to reasonably accommodate their religious beliefs under Title VII; (2) negligent handling of the COVID-19 pandemic; and (3) invasion of privacy. (Doc. 94-1). Austal moves for summary judgment as to all claims.

Plaintiffs concede that their negligence claims are "due to be dismissed." (Doc. 94 at 22). Therefore, summary judgment is **granted** in favor of Austal as to Plaintiffs' claims for **negligence**. The remaining questions are whether summary judgment is proper on the reasonable accommodation claims and the invasion of privacy claims.

### A. Reasonable Accommodation under Title VII

Under Title VII of the Civil Rights Act of 1964, employers must reasonably "accommodate the religious practice of their employees unless doing so would impose an 'undue hardship on the conduct of the employer's business.'" Groff v. DeJoy, 600 U.S. 447, 454 (2023) (quoting 42 U.S.C. § 2000e(j)). A *prima facie* case of religious discrimination is established when an employee shows that: (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. Morrissette-Brown v. Mobile Infirmary Med. Ctr., 506 F.3d 1317, 1321 (11th Cir. 2007). Like Austal, for purposes of this summary judgment order, the Court presumes that Plaintiffs have established a *prima facie* case of religious discrimination.

If a *prima facie* case is established, the burden shifts to the employer to prove that it has reasonably accommodated the employee or that it cannot reasonably accommodate the employee without incurring undue hardship. Id.  "Reasonably accommodate" is not defined in Title VII, but "the Supreme Court has explained that a reasonable accommodation . . . 'eliminates the conflict

between employment requirements and religious practices.'" Id. (quoting Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 70 (1986)). Austal does not argue that it reasonably accommodated Plaintiffs' religious exemption request. Instead, Austal argues that it "has met its burden of showing that accommodating some 160 employees who refused the COVID-19 vaccine would result in an undue hardship." (Doc. 87 at 15).

### 1. Undue hardship analysis.

The Supreme Court recently clarified the undue hardship standard under Title VII. "Undue hardship" is shown when an employer's burden is "substantial in the overall context of an employer's business." Groff v. DeJoy, 600 U.S. 447, 468 (2023). This is a "fact-specific inquiry." Id. An employer cannot "escape liability simply by showing that an accommodation would impose some sort of additional costs." Id. at 469. Those costs must be "excessive" or unjustifiable" to qualify as an *undue* hardship. Id. Thus, the plain language of Title VII requires something closer to "substantial additional costs" or "substantial expenditures." Id. In sum, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." Id. at 470. "[S]howing 'more than a de minimis cost,' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." Id. at 468.

In determining whether an employer faced an undue hardship, courts must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact" in the light of the nature, size, and operating cost of an employer. Id. at 470–71. Impacts on coworkers are relevant only if they affect the conduct of the business. Id. at 472. Moreover, it is not enough that an employer merely "assess the reasonableness of a particular possible accommodation or accommodations." Id. at 473. Courts must consider the context and

determine whether the employer has reasonably accommodated the employee's religion or has shown that granting the accommodation would pose an undue hardship. Id.

Austal provides three ways in which it believes it has demonstrated an undue hardship: (1) unvaccinated employees would bring an increased risk of contracting and spreading COVID-19; (2) accommodating the religious exemption requests would bring increased costs; (3) allowing nearly 160 employees to be unvaccinated would have been a potential violation of federal law. In support, Austal points to guidance from the Equal Employment Opportunity Commission ("EEOC") regarding COVID-19 vaccinations. The EEOC's notice concerning undue hardship guides employers to assess the particular facts of the case, including the work setting of the employee; to rely on objective information; and to consider the number of employees seeking a similar accommodation (i.e., the cumulative cost or burden on the employer). What You Should Know About COVID-19 and the ADA, The Rehabilitation Act, and Other EEO Laws, EEOC, https://www.eeoc.gov/wysk-what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L (last visited Dec. 3, 2024).

*First*, Austal argues that the danger in allowing the large number of religious exemption applications to remain unvaccinated constituted an undue hardship. Austal argues that it relied on objective data to conclude that unvaccinated employees were at a higher risk of contracting COVID-19. This data included guidance from the CDC and OSHA. Austal also sought specific guidance from medical professionals at the University of South Alabama and the Mobile County Health Department regarding the frequency with which unvaccinated employees would need to be tested. Austal received this guidance after it engaged in an individual analysis of how closely its employees would be required to work with other employees if allowed to work while unvaccinated. Austal argues that the uncontroverted evidence demonstrates that unvaccinated employees were at

a higher risk of contracting and spreading COVID-19 even with the use of masks, PPE, testing, and social distancing. Therefore, Austal informed Plaintiffs that it could not accommodate the requests for a religious exemption.

Austal cites numerous cases to support the proposition that it faced an undue hardship due to an increased risk of unvaccinated employees contracting and spreading COVID-19. Petersen v. Snohomish Reg'l Fire & Rescue, No. C22-1674 TSZ, 2024 WL 278973, at *7 (W.D. Wash. Jan. 25, 2024) (concluding, at summary judgment, that an employer could not reasonably accommodate plaintiffs' vaccine exemption requests without undue hardship because unvaccinated employees were at a greater risk of contracting and spreading COVID-19);[4] Bordeaux v. Lions Gate Ent., Inc., 703 F. Supp. 3d 1117, 1125, 1135 (C.D. Cal. 2023) (concluding, at summary judgment, that accommodating plaintiff's vaccine exemption request would have been an undue hardship in part because, as an actress, plaintiff could not wear PPE which increased the risk of endangering the plaintiff's coworkers); Beuca v. Washington State Univ., No. 2:23-CV-0069-TOR, 2023 WL 3575503, at *3 (E.D. Wash. May 19, 2023) (dismissing the plaintiff's complaint without leave to amend because employer successfully asserted undue hardship by showing that unvaccinated healthcare workers bring increased risk of infection), rev'd and remanded, No. 23-35395, 2024 WL 3450989 (9th Cir. July 18, 2024).[5] Bushra v. Main Line Health, Inc., 709 F. Supp. 3d 164, 176 (E.D. Pa. Dec. 28, 2023) (concluding, at summary judgment, that employer would suffer undue

---

[4] Peterson is on appeal in the Ninth Circuit.

[5] Beuca was issued before the Supreme Court clarified the "undue hardship" standard under Title VII in Groff v. DeJoy, 600 U.S. 447 (2023). On appeal, Beuca was remanded to the district court to examine undue hardship under Groff's clarified standard. Beuca v. Washington State Univ., No. 23-35395, 2024 WL 3450989, at *2 (9th Cir. July 18, 2024).

hardship in part because unvaccinated plaintiff would have caused health risk to coworkers and vulnerable patients).[6]

*Second*, Austal argues that the potential costs to accommodate Plaintiffs' exemption requests constituted an undue hardship. Austal points to the factors enumerated by the EEOC, including reliance on objective information and consideration of the culminative costs of all similar requests, to prove undue hardship. Austal argues that an estimated cost in excess of $1,000,000.00 per year to accommodate the exemptions is "certainly more than *de minimis*." (Doc. 87 at 18).

*Third*, Austal argues that—at the time it implemented its vaccine mandate—it understood that EO 14042 was going to require vaccination of all federal contractor employees. Austal explains that allowing nearly 160 employees to remain unvaccinated would have been a potential violation of federal law and would have put its federal contracts at risk. Austal contends that this factor also shows that accommodating Plaintiffs' requests would pose an undue hardship.

Plaintiffs respond by arguing that Austal's process in denying the religious accommodation requests "is so legally defective that it cannot constitute the 'substantial evidence' [Austal] needs to meet its burden." (Doc. 94 at 7). Plaintiffs argue that "Title VII requires some affirmative action by the employer to help resolve the employee's religious conflict." (Doc. 94 at 7). In support, Plaintiffs cite several cases explaining ways in which an employer can reasonably accommodate employees. See E.E.O.C. v. Texas Hydraulics, Inc., 583 F. Supp. 2d 904, 911 (E.D. Tenn. 2008) (explaining that the employer could have reasonably accommodated the employee by making other employees aware of the religious conflict and asking if they would be willing to swap shifts); E.E.O.C. v. Robert Bosch Corp., 169 F. App'x 942, 944–45 (6th Cir. 2006) ("In addition to allowing voluntary shift swaps, some employers have curried favor with affirmative actions like

---

[6] Bushra is on appeal in the Third Circuit.

holding meetings with the employee, attempting to find the employee another job, supplying the employee with a roster sheet containing the schedules of co-workers, and allowing the employee to advertise his need for shift swaps during daily roll calls and on the employer's bulletin board.").

Plaintiffs also cite caselaw to support the proposition that the employer is obligated to work with the employee in identifying possible accommodations. See Moates v. Hamilton Cnty., 976 F. Supp. 2d 984, 993 (E.D. Tenn. 2013) (explaining that the ADA "does require the employer . . . 'to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation.'" (quoting 29 C.F.R. § 160.2(o)(3)); E.E.O.C. v. Aldi, Inc., No. CIV.A. 06-01210, 2008 WL 859249, at *12 (W.D. Pa. Mar. 28, 2008) ("Title VII's reasonable accommodation provisions contemplate an *interactive process*, with cooperation between the employer and the employee, *but which must be initiated by the employer*." (quoting Kenner v. Domtar Industries, Inc., No. 04-CV-4021, 2006 WL 662466 at *1 (W.D. Ark. March 13, 2006)); Nichols v. Illinois Dep't of Transportation, 152 F. Supp. 3d 1106, 1124 (N.D. Ill. 2016) (explaining that a disputed issue of fact existed over the question of undue hardship in part because the employer never engaged in any dialogue with the employee about his request for accommodation).

In a footnote, Plaintiffs concede that the failure to confer with the employee is not an independent violation of Title VII. (Doc. 94 at 10 n.2). Indeed, nowhere in Groff v. DeJoy does the Court use the phrase "interactive process." 600 U.S. 447 (2023). Moreover, Plaintiffs have not cited a single case from the Eleventh Circuit which states that an "interactive process" is necessary before an employer can prove an undue hardship under Title VII. The "interactive process" requirement comes from the language of the ADA, not Title VII. Even in the ADA context, "an employer's failure to engage in the interactive process alone is not an independent basis for liability . . . ." Spurling v. C & M Fine Pack, Inc., 739 F.3d 1055, 1062 (7th Cir. 2014). Therefore, the fact

that Austal did not communicate with Plaintiffs—after Plaintiffs submitted their accommodation requests and before Austal denied them—does not preclude Austal from proving it faced an undue hardship.

The ultimate issue is whether Austal has shown, as a matter of law, "that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." Groff, 600 U.S. at 470. The relevant factors include the nearly 160 accommodation requests and their "practical impact" in the light of Austal's nature, size, and operating costs. Id. at 470–71.

The practical impact of Austal reasonably accommodating these requests included increased health and safety risks for all employees, increased operating costs, and potential violations of federal law. Plaintiffs' response argues that the increased health and safety risks associated with having unvaccinated workers "ignores multiple other realities, including . . . the effect of natural immunity . . . [and] the fact that vaccinated workers can also contract and transmit" COVID-19. (Doc. 94 at 12). Next, Plaintiffs argue that Austal's cost estimate is "equally myopic" and neglects the nature, size, and operating cost of Austal. (Doc. 94 at 13). Plaintiffs point to the fact that Austal's cost analysis treats every proposed accommodation request exactly the same and to the fact that Austal's revenue in the fiscal year of 2021 was $1,176,600,000.00.

Plaintiffs also cite another COVID-19 case in which an employer's motion for summary judgment was denied: Varkonyi v. United Launch All., LLC, No. 2:23-CV-00359-SB-MRW, 2024 WL 1677523, at *1 (C.D. Cal. Feb. 21, 2024). In Varkonyi, an employer (a federal contractor that built and launched rockets) implemented a COVID-19 vaccine mandate. Id. The employer denied all 109 religious exemption applications citing an undue hardship. Id. The employer provided several reasons for the denial, including evidence that the previous policy of masking, temperature

checks, and distancing was inadequate to prevent the spread of COVID-19; that tests were costly and limited; and that the government required the company to implement a vaccination policy. Id. The court concluded that the employer failed to show "that a reasonable jury must necessarily find that accommodating [the plaintiff] would impose undue hardship." Id. at *6. The court reasoned that the evidence failed to demonstrate how much it would have cost the employer to accommodate the objectors. Id. at *5. The court explained that the employer's cost estimate was based on a "nationwide testing program" that "assume[d] testing of all employees." Id. Moreover, the record indicated that the employer performed weekly testing for employees with medical exemptions and that the employer had not missed a scheduled launch before implementing the vaccination policy. Id. The court explained that the purported health effects and cost estimates provided by the employer neglected the fact that the other 96 percent of the workforce was vaccinated and that it was not clear why the employer could not continue to meet its scheduled launches. Id. The court also reasoned that the federal agency requirements for vaccinations were not sufficient to show undue hardship because the requirements expressly allowed for religious exemptions. Id. at *6. "In short, [the employer's] evidence of the burdens it anticipated [was] not tailored to [the plaintiff's] accommodation request." Id.

Here, Plaintiffs compare Austal's purported reasons with the defendant's reasons in Varkonyi. Plaintiffs argue that Austal's cost projections are inadequate because they do not accurately portray the cost of accommodation as to any individual or the aggregate plaintiffs. Plaintiffs contend that Austal's stated effects neglect that the workforce was partially vaccinated. And Plaintiffs argue that the government requirements specifically provide religious exemptions. Plaintiffs also point out that, like the employer in Varkonyi, Austal denied every religious request but granted some

medical exemptions that required the same testing. Plaintiffs argue that the same reasons that precluded summary judgment in Varkonyi preclude summary judgment here.

Austal's reply distinguishes Austal from the employer in Varkonyi because "Austal took specific steps to estimate the cost of testing, given the approximate number of employees to be tested." (Doc. 97 at 8). Austal argues that the "steps taken by Austal stand in sharp contrast to those by the employer in Varkonyi." (Id).

The Title VII undue-hardship standard requires "context-specific application." Groff, 600 U.S. at 473. Here, the context is a federal contracting shipbuilder trying to navigate the COVID-19 pandemic. Most of the cases cited by Plaintiffs miss the boat. Plaintiffs illustrate two cases involving single employees. One employee refused to work on Sundays. E.E.O.C. v. Aldi, Inc., No. CIV.A. 06-01210, 2008 WL 859249 (W.D. Pa. Mar. 28, 2008). The other wanted a quiet place to pray at work. Nichols v. Illinois Dep't of Transportation, 152 F. Supp. 3d 1106 (N.D. Ill. 2016). But Plaintiffs' use of Varkonyi is persuasive because the context is similar.

Varkonyi also involved a federal contractor attempting to navigate the COVID-19 pandemic. Varkonyi, 2024 WL 1677523. There, the employer unsuccessfully used many of the same reasons in denying all of its religious accommodation requests (health risks, costs, federal requirements). And the Varkonyi employer also had employees die of COVID-19. Varkonyi, 2024 WL 1677523, at *1.

Austal argues that the steps taken by Austal stand in sharp contrast to those by the employer in Varkonyi. This is partially true. Austal provided evidence of how much it would cost to accommodate only the roughly 160 religious objectors while the Varkonyi employer only provided cost estimates for testing its entire workforce. Varkonyi, 2024 WL 1677523, at *5. Thus, the main difference between Varkonyi and this case is that the evidence demonstrates about how much

accommodating the religious objectors would cost. The bottom line is whether the increased health risks and the $1,000,000.00-plus yearly costs were substantial enough to create an undue hardship on Austal.

At this stage, Austal has not shown that it is entitled to summary judgment on the reasonable accommodation claim. Although Austal has provided an estimated cost to accommodate, it has not provided evidence that would establish *as a matter of law* that it was facing an undue hardship. Austal has argued that the million dollar per year cost is "certainly more than *de minimis*." (Doc. 87 at 18). But that is no longer the standard. According to the Supreme Court, the cost must be "substantial in the overall context of an employer's business." Groff v. DeJoy, 600 U.S. 447, 468 (2023). In other words, the cost must be "excessive" or "unjustifiable" to qualify as an undue hardship. Id. at 469. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Austal was not facing an undue hardship. Therefore, summary judgment is **denied** as to the **Title VII claim**.

**B. Invasion of Privacy**

"Alabama has long recognized that a wrongful intrusion into one's private activities constitutes the tort of invasion of privacy." Butler v. Town of Argo, 871 So. 2d 1, 12 (Ala. 2003). Invasion of privacy consists of four distinct wrongs: (1) intrusion on seclusion; (2) public disclosure of private information; (3) false light; and (4) appropriation for commercial use. Id. Plaintiffs argue that they have a claim for the second form: public disclosure of private information which violates ordinary decency. (Doc. 94 at 18).[7]

---

[7] Plaintiffs concede that they do not have a viable claim under the first, third, and fourth forms. (Doc. 94 at 17).

Plaintiffs contend that Austal publicly disclosed their private information regarding their vaccination status in two ways. *First*, by requiring unvaccinated employees—but not vaccinated employees—to wear masks. *Second*, by allowing only vaccinated employees to wear stickers.

Public disclosure of private information is an actionable tort when the matter publicized is of a kind that: "(a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Ex parte Birmingham News, Inc., 778 So. 2d 814, 818 (Ala. 2000) (quoting Restatement (Second) of Torts § 652D (1977)). Austal argues that Plaintiffs' public disclosure theory regarding their vaccination statuses fails on both elements.

*First*, Austal argues that the disclosure of Plaintiffs' vaccination statuses was not highly offensive to a reasonable person because Plaintiffs openly discussed their vaccination statuses to others, including those at work. In support, Austal cites Hill v. Branch Banking & Tr. Co., 264 F. Supp. 3d 1247, 1267 (N.D. Ala. 2017) (granting summary judgment for employer on invasion of privacy claim because plaintiff publicly discussed the information in question with her coworkers). *Second*, Austal argues that the COVID-19 pandemic and the vaccine were matters of public concern.

In response, Plaintiffs provide four reasons why they believe Austal invaded on their privacy. *First*, their invasion of privacy is specific to each Plaintiff. *Second*, Austal did not provide specifics as to the timing of Plaintiffs' alleged disclosures. *Third*, it is not clear whether Plaintiffs discussed their vaccination statuses with only those already aware of it or with those who had prior knowledge. *Fourth*, there was not a legitimate health interest in disclosing Plaintiffs' vaccination statuses.

Plaintiffs also cite Horne v. Patton: "When a patient seeks out a doctor and retains him, he must admit him to the most private part of the material domain of man. Nothing material is more

important or more intimate to man than the health of his mind and body." 287 So. 2d 824, 830 (Ala. 1973) (quoting Hammonds v. Aetna Casualty & Surety Co., 243 F. Supp. 793, 801 (N.D. Ohio 1965)). Plaintiffs' reliance on this quote, however, is misguided. Horne, and the case Horne quoted, involved a doctor revealing information that the plaintiff provided to the doctor during treatment. See Horne, 287 So. 2d at 825; Hammonds, 243 F. Supp. at 795. Here, Austal does not have the same doctor–patient relationship with Plaintiffs. Moreover, the Horne court explained that "[i]f the defendant doctor in the instant case had a legitimate reason for making this disclosure under the particular facts of this case, then this is a matter of defense." Horne, 287 So. 2d at 831.

Plaintiffs are correct that there are material issues of fact concerning whether they openly discussed their vaccination statuses with coworkers. Guy discussed his vaccination status with his supervisor, and Allen discussed his vaccination status with his family, pastor, and a coworker. But there is not undisputed evidence that Guy and Allen "publicly discussed" their vaccination status with coworkers. Cf. Hill v. Branch Banking & Tr. Co., 264 F. Supp. 3d 1247, 1267 (N.D. Ala. 2017) (plaintiff publicly discussed the topics of the invasion of privacy claim). Therefore, the issue hinges on whether Austal had a legitimate reason for disclosing Plaintiffs' vaccination statuses under the facts of the case.

The Second Restatement of Torts provides: "When the subject-matter of the publicity is of legitimate public concern, there is no invasion of privacy." Restatement (Second) of Torts § 652D (1977). For example, in Middlebrooks v. State Board of Health, an Alabama law required the disclosure of information regarding HIV and AIDS patients, including names and addresses of persons infected. Middlebrooks v. State Bd. of Health, 710 So. 2d 891, 891 (Ala. 1998). The Alabama Supreme Court explained that the disclosure of this information was not an invasion of

privacy because "the prevention of the spread of HIV and AIDS is a legitimate governmental interest." Id. at 892–93.[8]

Plaintiffs argue that Austal did not have a legitimate interest in knowing their vaccination statuses for two reasons. *First*, "the vaccine does not prevent an individual from getting COVID, nor does it prevent an individual from spreading COVID." (Doc. 94 at 20). Plaintiffs quote a CDC article which states that "[v]accines are not always effective at preventing infection . . . ." and clarifies that the "purpose of the vaccine" is to provided sustained protection against disease and death. 5 Things You Should Know about COVID-19 Vaccines, CDC (Oct. 13, 2023, 2:00 PM), https://www.cdc.gov/ncird/whats-new/5-things-you-should-know.html (last visited Dec. 4, 2024). *Second*, Austal's mask policy of only requiring the unvaccinated to wear masks is contrary to OSHA guidance. Plaintiffs quote a Frequently Asked Questions ("FAQs") webpage from OSHA which states: "In areas with substantial or high transmission, employers should provide face coverings for all workers, as appropriate, regardless of vaccination status." Frequently Asked Questions, OSHA https://www.osha.gov/coronavirus/faqs (last visited Dec. 5, 2024). For the same

---

[8] The Alabama Supreme Court relied on the Westinghouse factors from a Third Circuit case to determine that the disclosure was justified. Middlebrooks, 710 So. 2d at 891. In Westinghouse, the court explained:

> The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified are the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

United States v. Westinghouse Electric Corp., 638 F.2d 570, 578 (3d Cir.1980).

reasons, Plaintiffs argue that Austal had no legitimate interest in knowing who was required to wear a mask through its sticker policy.

Plaintiffs' arguments concerning Austal's interest in its mask and sticker policy are not persuasive. To start, the CDC article upon which Plaintiffs rely was published in October 2023, and there is no date associated with the OSHA FAQ webpage. Therefore, these sources do not prove that Austal lacked a legitimate interest in its mask and sticker policy at the time in question. More importantly, the sources do not support Plaintiffs' argument. For example, the OSHA FAQs guide employers to "provide" masks for all workers, "regardless of vaccination status." Frequently Asked Questions, supra. They also note that employers "can suggest or require" that (1) unvaccinated individuals wear masks in public workplaces and that (2) all individuals wear masks in public, indoor settings of high transmission. Id. But it does not support Plaintiffs' argument that employers lack a legitimate interest in requiring unvaccinated workers to wear masks. Furthermore, the latter half of the CDC article quoted by Plaintiffs explains that "there is extensive data showing that these vaccines prevent severe illness and protect the public's health." 5 Things You Should Know about COVID-19 Vaccines, supra.

To determine whether Austal's mask and sticker policy was of legitimate public concern, the Court must balance the competing interests of Austal and the plaintiffs. Austal had an interest in maintaining the health and safety of its workforce. Austal's actions were based on the obvious risks of COVID-19, objective data, and federal mandates regarding vaccinations. On the other hand, the plaintiffs desired to remain unvaccinated and to keep their vaccination statuses private. At the time, the prevention and spread of COVID-19 was, as a matter of law, a matter of public concern. Austal relied on objective data to determine that vaccinations and masking would protect its interests, and the interests of its employees. The potential harm to Plaintiffs—the fact that other

employees could infer that Plaintiffs were unvaccinated—does not outweigh the public interest in requiring unvaccinated workers to wear masks. Therefore, summary judgment is **granted** in favor of Austal as to the **invasion of privacy claim**.

### IV.    Conclusion

Plaintiffs allege three causes of action against Austal: (1) failure to reasonably accommodate their religious beliefs under Title VII; (2) negligent handling of the COVID-19 pandemic; and (3) invasion of privacy. There is a genuine dispute over whether Austal faced an undue hardship regarding religious accommodation. Therefore, summary judgment is **denied** as to Plaintiffs' **Title VII claims**. Plaintiffs have conceded that their negligence claims are due to be dismissed. Therefore, summary judgment is **granted** as to Plaintiffs' **negligence claims**. No reasonable jury could find that the prevention and spread of COVID-19 was not a matter of legitimate public concern. Therefore, summary judgment is **granted** as to Plaintiffs' **invasion of privacy claims**.

**DONE** and **ORDERED** this **3rd** day of **January 2025.**

 /s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**